IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Mary Alice Walter, | : | Case No. 1:05-CV-327 |
| | : | |
| Plaintiff, | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER GRANTING IN PART AND |
| Zoological Society of Cincinnati d/b/a | : | DENYING IN PART DEFENDANT'S |
| Cincinnati Zoo & Botanical Garden, | : | MOTION FOR SUMMARY |
| | : | JUDGMENT |
| Defendant. | : | |

This matter is before the Court in this matter on Defendant's Motion for Summary

Judgment (doc. 15).  For the reasons that follow, the Court **GRANTS IN PART AND DENIES**

**IN PART** Defendant's motion.

I.      **FACTUAL BACKGROUND**

Both parties set forth the factual history giving rise to this lawsuit in detail.  The Court

herein will recount only those portions of the evidentiary record necessary to determine the

Defendant's motion.

Defendant Zoological Society of Cincinnati d/b/a Cincinnati Zoo & Botanical Garden

("the Zoo" or "Cincinnati Zoo") hired Plaintiff Mary Alice Walter in July 1997 as a secretary in

the Volunteer Service Office ("VSO").  In late 1998, the Zoo promoted Walter to the position of

Volunteer Coordinator.  This case arises from Walter's allegations that she was sexually harassed

by her supervisor and the Zoo's Human Resources Director, Robert Coleman, intermittently

from September 1999 through June 2002.  Her primary allegations are that Coleman gave her an

unsolicited kiss and placed his hands on her buttocks in September 1999 following the Zoofari

1

fundraising event at the Zoo and that he wheedled his way into the hot tub at her home in June 2002 following a Zoo softball game.  She alleges that he sat naked in the hot tub, rubbed an arm and leg against her, and exposed himself to her.

In between these events, Walter alleges that Coleman made inappropriate comments to her.  Walter testified that Coleman (1) made comments filled with innuendo that she had a sexual relationship with a male who rented a room at her house, (2) talked about his prior sexual experiences, including that his wife found him with other women before they were married, (3) suggested that she share a hotel room with him when they attended an out-of-town work conference, and (4) implied that Walter should spend a weekend at a cabin in Kentucky with him.  Regarding the third incident, Walter stated that she was shocked and had to leave the office after Coleman had asked her if "maybe you'll even let me stay in your [hotel] room."  (Walter Dep. at 67.)  Walter did not attend the conference.  Regarding the fourth incident, Walter stated that Coleman told her that he wanted to see if he could get into trouble at the cabin and he did not think it was something his wife would want to do.

Walter further alleges that Coleman treated her differently in the workplace after she rebuffed him following the June 2002 hot tub incident.  Generally, she alleges that he was less supportive of the VSO, scrutinized her work more carefully, and criticized her performance.  She also alleges that he interfered with her relationships with co-workers and Zoo management.  Walter reported Coleman for sexual harassment to the Zoo President in December 2002.  The Zoo forced Coleman to resign following an investigation.

Karen Wilson replaced Coleman after he resigned.  Walter learned from Wilson after Coleman's resignation that Wilson had reported Coleman for sexual harassment in mid-1998.

2

Coleman was required to apologize to Wilson after those alleged incidents of harassment, but he was not otherwise disciplined.

Despite the fact that Wilson also was an alleged victim of harassment, Walter asserts that Wilson and other Zoo management retaliated against her for reporting Coleman after December 2002. She alleges that she was cut off from regular communication with Zoo management, including from Gregory Hudson, the Zoo President, and Jack Huelsman, a Senior Vice President, and from David Jenike and Dan Marsh from the Zoo Education Department. She also alleges that she was denied adequate paid staffing in the VSO needed to fulfill the duties assigned to VSO. Walter resigned her employment in December 2003 and asserts now that she was constructively discharged.

Walter filed the instant suit against the Cincinnati Zoo on May 11, 2005. She asserted sexual discrimination, retaliation, and related claims arising from Coleman's purported harassing conduct and the Zoo's response to her complaints about Coleman. Discovery is completed. The Cincinnati Zoo now has moved for summary judgment on all claims asserted against it and Walter has filed her briefs in opposition.

## II.    STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, the moving party has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. Matsushita

Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).

        The moving party may support a motion for summary judgment with affidavits or other

proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear

the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  In responding to

a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go

beyond the pleadings and "present affirmative evidence in order to defeat a properly supported

motion for summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The nonmoving party "must set forth specific facts showing there is a genuine issue for trial."

Fed. R. Civ. Pro. 56(e).  The Court's task is not "to weigh the evidence and determine the truth

of the matter but to determine whether there is a genuine issue for trial."  Liberty Lobby, 477

U.S. at 249.  A genuine issue for trial exists when there is sufficient "evidence on which the jury

could reasonably find for the plaintiff."  Id. at 252.

## III.     ANALYSIS

## A.     Discrimination/Sexual Harassment

        Walter alleges that she was sexually harassed in violation of Ohio Revised Code

("O.R.C.") chapter 4112 and the common law.  To prove a claim of sexual harassment or hostile

environment discrimination under Ohio law a plaintiff must establish the following elements:

> (1) that the harassment was unwelcome, (2) that the harassment was based on sex,
> (3) that the harassing conduct was sufficiently severe or pervasive to affect the
> "terms, conditions, or privileges of employment, or any matter directly or
> indirectly related to employment," and (4) that either (a) the harassment was
> committed by a supervisor, or (b) the employer, through its agents or supervisory
> personnel, knew or should have known of the harassment and failed to take
> immediate and appropriate corrective action.

Hampel v. Food Ingredients Specialties, Inc., 89 Ohio St.3d 169, at syllabus ¶ 2, 729 N.E.2d 726

(2000).  Both parties appropriately cite to both Ohio and federal case law in analyzing the sexual

harassment claims asserted under Ohio law.  Id., 89 Ohio St.3d at 175 (relying on Plumbers &

Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm., 66 Ohio St.2d 192, 196,

421 N.E.2d 128 (1981)).

 The Cincinnati Zoo moves for summary judgment on the bases that Walter can neither

establish that the alleged harassing conduct was unwelcome, nor establish that the conduct was

so severe and pervasive to affect the terms, conditions, or privileges of her employment.  Walter

overcomes the Zoo's first argument easily.  A reasonable jury could credit Walter's testimony

that she told Coleman after several of the alleged incidents and before the hot tub incident that

she did not want a relationship with him, and that jury could conclude that Coleman's conduct

was unwelcome.  The Zoo's second argument presents a closer question.

 The Supreme Court has described the conduct that is so severe and pervasive as to alter

working conditions as follows:

> [The standard] takes a middle path between making actionable any conduct that is
> merely offensive and requiring the conduct to cause a tangible psychological
> injury. . . .  [The] mere utterance of an epithet which engenders offensive feelings
> in an employee does not sufficiently affect the conditions of employment to
> implicate Title VII. Conduct that is not severe or pervasive enough to create an
> objectively hostile or abusive work environment–an environment that a
> reasonable person would find hostile or abusive–is beyond Title VII's purview.
> Likewise, if the victim does not subjectively perceive the environment to be
> abusive, the conduct has not actually altered the conditions of the victim's
> employment, and there is no Title VII violation.

Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22, 114 S.Ct. 367 (1993) (internal quotation and

citation omitted).

 Alleged incidents of harassment are not to be viewed in isolation.  Rather, courts must

"view the work environment as a whole and consider the totality of all the facts and surrounding

circumstances, including the cumulative effect of all episodes of sexual or other abusive treatment." Hampel, 89 Ohio St.3d 169, at syllabus ¶ 5.  Courts can look at frequency and severity of the discriminatory conduct, whether it is physically threatening or humiliating, whether it interferes with the plaintiff's work performance, and whether it affects the plaintiff's psychological well-being.  See Harris, 510 U.S. at 23.

The Zoo, in arguing for summary judgment, characterizes Walter's evidence of consisting of two primary incidents of alleged harassment separated by almost three years–the 1999 Zoofari kissing incident and the 2002 hot tub incident–and a few comments that amounted to sexual banter.  Looking at the evidence and the inferences that reasonably can be drawn therefrom in a light most favorable to Walter, a jury might disagree with the Zoo's characterization of the interactions between Coleman and Walter.  See Matsushita Elec. Indus. Co., Ltd., 475 U.S. at 585-87 (setting forth the summary judgment standard).  The jury might find significant the fact that Coleman, the alleged harasser, was the Zoo's Human Resources Director and Walter's direct supervisor.  Williams v. General Motors Corp., 187 F.3d 553, 563, 566 (6th Cir. 1999) (noting that the plaintiff's "own supervisor" made her target of unwanted sexual innuendo and recognizing that a plaintiff might be reluctant to report harassment by her supervisor).  Additionally, the jury might find significant that the two primary incidents both included an "element of physical invasion" and were not mere offensive comments.  Id. at 563 (highlighting incidents that had an "element of physical invasion").  A jury might characterize the unsolicited kiss after the 1999 Zoofari as an offensive battery.  It also might credit Walter's testimony that she felt endangered during the hot tub incident when Coleman became upset after Walter stated she would tell her boyfriend what had happened, especially in light of the fact that

he was naked and had exposed himself to her.

The physical nature of those incidents might also color the jury's perception about the other incidents about which Walter complains.  For example, a jury might consider Coleman's suggestions that they share a hotel room at a work conference or share a cabin on vacation more offensive or threatening in the totality of the circumstances.  Supporting that inference is Walter's testimony that she passed on the opportunity to attend an out-of-town work conference because Coleman wanted to share a hotel room.  Finally, the jury might find significant that the offensive comments were specifically directed at Walter on the job and were not merely comments that Coleman directed towards other people in Walter's presence.  In sum, a reasonable jury looking at the totality of the circumstances could conclude that Coleman's behavior created an objectively abusive work environment for Walter.  Accordingly, the Court will deny the Zoo's motion as to the harassment claim.

**B.      Discrimination/Disparate Treatment**

In her Complaint, Walter alleges that she was discriminated against on the basis of her gender when the Zoo treated her differently than similarly situated male employees.  As the Zoo points out in its motion, Walter has put forth no evidence that she was subject to disparate treatment.  Her evidence of alleged  discrimination  instead is based on (1) harassment or hostile work environment and (2) retaliation.  Accordingly, the Zoo's motion is granted to the extent any discrimination claim is based solely on a theory of disparate treatment.

**C.      Discrimination/Retaliation**

Walter alleges in this claim that she was subjected to harassment and was constructively discharged by the Zoo in retaliation for her complaints against Coleman.  To state a prima facie

case for retaliation, the plaintiff must demonstrate the following by a preponderance of the

evidence:

> (1) the plaintiff engaged in activity that Ohio Revised Code 4112 protects;
> (2) the defendant employer knew that she engaged in this protected activity;
> (3) the defendant employer subsequently took an employment action adverse to
> the plaintiff; and
> (4) a causal connection between the protected activity and the adverse
> employment action exists.

Martin v. General Elec. Co., 187 Fed.Appx. 553, 559 (6th Cir. 2006).  The Sixth Circuit has

applied to claims arising under Ohio law the Supreme Court's recent instruction in Burlington N.

& Santa Fe Ry. Co. v. White, 548 U.S. ----, 126 S.Ct. 2405 (2006), that an adverse employment

action in this context is one that would have dissuaded a reasonable employee from making or

supporting a charge of discrimination.  Id.  Walter here alleges several ways the Zoo retaliated

against her and asserts that retaliation was so severe that she was forced to resign.

> To state a constructive discharge claim, a plaintiff must establish that her employer

(1) "deliberately create[d] intolerable conditions, as perceived by a reasonable person" (2) "with

the intention of forcing" her to quit and (3) she actually must quit.  See Moore v. KUKA

Welding Sys. and Robot Corp., 171 F.3d 1073, 1080 (6th Cir. 1999).  Courts consider the

following non-exclusive list of factors, alone or in combination, when examining a constructive

discharge claim:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities;
> (4) reassignment to menial or degrading work; (5) reassignment to work under a
> younger supervisor; (6) badgering, harassment, or humiliation by the employer
> calculated to encourage the employee's resignation; or (7) offers of early
> retirement or continued employment on terms less favorable than the employee's
> former status.

Logan v. Denny's, Inc., 259 F.3d 558, 569 (6th Cir. 2001).

8

To begin, Walter does not assert that she was demoted, received a cut in pay, suffered a reduction in job responsibilities, or was asked to resign.  Instead, she alleges harassment, isolation from her superiors, and an increase in job responsibilities.  Many of Walter's arguments in regards to this claim do not withstand evidentiary scrutiny.  For example, Walter's suspicion that Coleman poisoned her relationship with David Jenike and Dan Marsh, both from the Zoo's Education Department, is not supported by the evidence.  Both testified that they did not know about Walter's problems with Coleman until after Walter had resigned, and Marsh testified specifically that Coleman had not criticized Walter to him.   (Marsh Dep. at 11, 13; Jenike Dep. at 23-24.)  Likewise, Walter presents no evidence to support her belief that she was excluded from the Zoo's Senior Staff meetings and otherwise isolated from Zoo management personnel in retaliation for reporting Coleman's harassment.  The Zoo, conversely, offers evidence that the several employees, including Walter, were excluded from Senior Staff meetings beginning in April 2003 as a result of the Zoo President's decision to change the format for the meetings. (Voss Decl.)  Her decreased communication with Jack Huelsman, a Senior Vice-President at the Zoo, and Gregory Hudson, the Zoo President, followed naturally from this change.  Further, the VSO department at the Zoo began reporting to Lori Voss in January 2003, whereas it had previously reported to Huelsman.  (Id.)  This change also would have decreased Walter's interactions with Huelsman.

The remaining evidence simply is not sufficient to create a genuine dispute of fact for a jury.  Walter alleges that following the June 2002 hot tub incident, Coleman scrutinized her work more carefully, did not support the VSO, and possibly encouraged her to quit when he stated that he would help her pack.  Walter's allegations about increased scrutiny by Coleman are non-

9

specific.  The proposed changes to the volunteer program which Walter opposed might have affected the volunteers' experience at the Zoo, but would not have directly impacted Walter's position at all.  These allegations against Coleman as a whole tend to constitute petty annoyances more than adverse employment actions.  Moreover, the specific events occurred before Walter reported Coleman's behavior to the Zoo's President and before Coleman was forced to resign. Walter had not engaged in protected activity for purposes of the retaliation statute at this time because Coleman was not likely to report to Zoo management that Walter had objected to his offensive behavior.  See Nielson v. Acorn Corrugated Box Co., No. 01 C 1988, 2002 WL 1941365, at *5 (N.D. Ill. Aug. 21, 2002) (stating that complaints made by employee to supervisor who was also the harasser were not protected activity).  In any event, a reasonable jury could not conclude that these events would cause a reasonable employee to resign her position one year later.

Walter's final contention is that she was overworked in the VSO because the department was denied adequate staffing. To begin, Walter offers no direct evidence that the Zoo made any staffing decisions for the VSO to retaliate against Walter for reporting Coleman for sexual harassment.  Moreover, the timeline of events in evidence does not support an inference that the Zoo's decisions on VSO staffing were made to retaliate against Walter.  Walter had lost her one full-time assistant in the VSO in July 2002.  Her remaining assistant, Grace Rettig, worked part-time in the VSO from June 2001 until January 2003.  Walter had  requested that Rettig be upgraded to full-time status prior to the date in December 2002 that Walter reported Coleman for harassment.  The Zoo's unwillingness to fund a full-time assistant position in the VSO in the time period before Walter engaged in the statutorily protected activity cannot be evidence of

retaliation. In January 2003, Rettig accepted a full-time position in another department at the Zoo. The facts are disputed whether the Zoo provided Walter and the VSO with funding to replace Rettig with a paid assistant from a period of January 2003 until June 2003. In June 2003, a new permanent part-time assistant was hired. However, Walter had been able to use volunteers and human resources temporary employees to help staff the VSO during the interim period. Walter suffered no additional staffing reductions from June 2003 until she resigned effective December 2003.

After Walter resigned, the VSO continued to be staffed only by the paid volunteer coordinator who replaced Walter and one part-time assistant until April 2005. The fact that the VSO was staffed with the same two paid positions, a full-time coordinator and a part-time assistant, from July 2002, well before Walter reported Coleman for harassment, until April 2005, well after Walter resigned, defeats any possible inference of retaliation. Accordingly, there are no material facts in dispute and the Zoo is entitled to summary judgment on the retaliation claim as a matter of law.

**D.     Breach of Public Policy**

In this claim, Walter asserts that the Zoo violated Ohio's public policy against sexual harassment, sexual discrimination, and retaliation. The claim fails to the extent it is based on theories of disparate treatment and/or retaliation for the same reason the statutory claims based on those theories failed.

The claim also fails to the extent it is based on a theory of sexual harassment. The remedies provided in O.R.C. chapter 4112 adequately compensate any victim of sexual discrimination in Ohio. Carrasco v. NOAMTC, Inc., No. 03-4229, 2004 WL 2756838, at *7 (6th

Cir. Dec. 1, 2004); Nelson v. Scotts Co., No. C2-05-159, 2005 WL 2373439, at *2-3 (S.D. Ohio

Sept. 27, 2005).  Accordingly, there is no need to recognize a separate claim for sexual

harassment.  See e.g., Thaman v. OhioHealth Corp., No. 2:03 CV 210, 2005 WL 1532550, at *1,

16 (S.D. Ohio June 29, 2005) (dismissing Ohio public policy claim where plaintiff had alleged

sexual harassment).  The Cincinnati Zoo is entitled to summary judgment on this claim.

**E.     Negligent Retention**

        Walter alleges in this claim that the Cincinnati Zoo is liable for negligent retention

regarding its employment of Coleman.  Courts in Ohio recognize a claim for negligent retention

or supervision if the plaintiff can establish the following elements:

> (1) the existence of an employment relationship; (2) the employee's
> incompetence; (3) the employer's actual or constructive knowledge of such
> incompetence; (4) the employee's act or omission causing the plaintiff's injuries;
> and (5) the employer's negligence in hiring or retaining the employee as the
> proximate cause of plaintiff's injuries.

Bush v. American Honda Motor Co., Inc., 227 F.Supp.2d 780, 801 (S.D. Ohio 2002) (citing

Steppe v. Kmart Stores, 136 Ohio App.3d 454, 737 N.E.2d 58, 66 (1999)).  Recent law from this

Circuit requires that a plaintiff also be able to establish a tort claim against the individual

employee in order to prevail in a negligent retention claim against the employer.  See  Minnich

v. Cooper Farms, Inc., 39 Fed.Appx. 289, 295 (6th Cir. 2002); Deters v. Rock-Tenn Co., Inc.,

No. C-1-04-811, 2006 WL 2711683, *13 (S.D. Ohio Sept. 21, 2006); Rubin v. Ford Motor Co.,

No. 1:04-CV-836, 2006 WL 2128934, *7 -8 (S.D. Ohio July 27, 2006).[1]

---

[1] This requirement is based on the following Ohio Supreme Court language: "[A]n
underlying requirement in actions for negligent supervision and negligent training is that the
employee is individually liable for a tort or guilty of a claimed wrong against a third person, who
then seeks recovery against the employer."  Strock v. Pressnell, 38 Ohio St.3d 207, 217, 527
N.E.2d 1235 (1988).

The Court earlier found that genuine issues of material fact preclude summary judgment on the issue of whether Coleman sexually harassed Walter and whether the Zoo is liable therefore.  The primary issues in dispute on the negligent retention for purposes of the Zoo's motion are whether the Zoo had actual or constructive knowledge of Coleman's propensity towards sexual harassment and whether the Zoo was negligent in retaining his employment.  It is undisputed that Karen Wilson had complained to Ed Maruska, then the Zoo President, in mid-1998 regarding two incidents of allegedly inappropriate conduct by Coleman.  Coleman had given her an unsolicited kiss in November 1997 after learning the Zoo levy had failed.  (Wilson Dep. at 39-40; Coleman Dep. at 44-46.)  Then in the summer of 1998, Coleman cancelled one of two hotel reservations that Wilson had made for the two of them to attend an out-of-town conference with the intention that they would share a room.  Maruska reprimanded Coleman for his "[t]errible, terrible judgment" and stated his opinion that Coleman's behavior had sexual overtones.  "You are wanting a single room for both of you . . . and if that isn't sexual what is?" (Coleman Dep. ex. 1.)

Examining the evidence in a light most favorable to Walter, the Court finds that a reasonable jury could conclude that the Zoo knew or should have known that Coleman was a risk to commit sexual harassment after Wilson reported these incidents to the Zoo in mid-1998.  The Court will deny the Zoo's motion on the negligent retention claim.

**F.  Infliction of Emotional Distress**

Walter also alleges a claim for intentional or reckless infliction of emotional distress based on the Zoo's inability to keep her safe from Coleman and from retaliation by other employees.  The Cincinnati Zoo moved for summary judgment on this cause of action, in part,

13

on the basis that Walter cannot establish as a matter of law that she suffered the requisite serious

emotional injury needed to establish the claim.  The Court agrees.  The Ohio Supreme Court has

described the level of serious emotional injury the plaintiff must establish to state a claim as

follows:

> By the term "serious," we of course go beyond trifling mental disturbance, mere
> upset or hurt feelings. We believe that serious emotional distress describes
> emotional injury which is both severe and debilitating. Thus, serious emotional
> distress may be found where a reasonable person, normally constituted, would be
> unable to cope adequately with the mental distress engendered by the
> circumstances of the case.

Paugh v. Hanks, 6 Ohio St.3d 72, 78, 451 N.E.2d 759 (Ohio 1983).  Walter does not proffer

evidence to meet this burden of proof.

To support her claim, Walter testified that the approximately 10-day period between

when she reported Coleman to Hudson and Coleman's resignation was "incredibly stressful" and

that she "firmly believed [she] lost ten years off of [her] life."  (Walter Dep. at 18.)  She also

asserted that a surgery she needed in July 2003 to have a cyst-covered ovary removed was

related to the stress, but she did not recall if a doctor had made that connection.  (Id. at 187-88.)

Finally, she asserted that her hair was falling out, but she did not seek any medical treatment.

(Id. at 188.)

In rebuttal, the Zoo points out that Walter did not seek medical or psychiatric treatment at

the time of or immediately after the events in question.  She has not been prescribed any

prescription medicine to deal with any feelings of depression or anxiety.  (Walter Dep. at 24,

176-77.)  Finally, the Zoo points out that Walter began working at Kroger in March 2004, three

months after her employment with the Zoo ended, and she attended an 18-month, approximately

35-hour per week massage therapy certification program beginning in April 2004.

The evidence here, or lack thereof, concerning the emotional injury suffered by Walter is analogous in its seriousness to that in cases in which courts have held that the plaintiffs did not suffer injuries that were sufficiently severe and debilitating to support a claim for infliction of emotional distress.  See e.g., Vickers v. United Parcel Service, Inc., 898 F.2d 155, No. 89-3583, 1990 WL 27163, at *1 (6th Cir. Mar. 14, 1990) (sleepless nights and lack of trust in people not enough to prove severe emotional distress where no medical or psychiatric treatment sought); Gagne v. Northwestern Nat'l Ins. Co., 881 F.2d 309, 318 (6th Cir. 1989) (not sleeping, feeling that she was a different person, and feeling withdrawn not sufficient where plaintiff never sought medical or psychiatric treatment and she never missed work); Polkow v. CSX Trans., Inc., No. 1:02 CV 72, 2003 WL 23784462, at *10 (N.D. Ohio Oct. 1, 2003) (granting summary judgment to defendant on infliction of emotional distress claim where plaintiff alleged she was distraught and had trouble sleeping, but plaintiff did not seek medical or psychiatric treatment).  Here Walter offers only her own generalized and speculative opinion that the stress she suffered caused her to lose years off her life, her hair to fall out, and contributed to an ovarian cyst condition.  She offers no expert medical testimony to support her contentions about the medical injuries.  Expert medical testimony is not needed in all cases to prove the requisite level of emotional injury.  However, if the plaintiff does not offer medical testimony, the plaintiff usually must support her claim with evidence from other lay witnesses who can testify as to marked changes in the plaintiff's emotional or habitual make-up.  Davis v. City of East Cleveland, Ohio, No. 1:03 CV 2075, 2006 WL 753129, at *15 (N.D. Ohio Mar. 22, 2006); Powell v. Grant Med. Center, 148 Ohio App.3d 1, 6-7 ¶ 16, 771 N.E.2d 874 (2002).  Walter's testimony alone is not sufficient in these circumstances to establish a claim for severe and debilitating emotional injury

15

in the absence of other supporting evidence.  Therefore, the Zoo is entitled to summary judgment on this claim as a matter of law.

**IV.     CONCLUSION**

For the foregoing reasons, the Defendant's Motion for Summary Judgment (doc. 15) is **GRANTED IN PART AND DENIED IN PART**.  Summary judgment is granted in favor of Defendant on Walter's claims for disparate treatment discrimination, retaliation, breach of public policy, and intentional/reckless infliction of emotional distress.  Summary judgment is denied as to the claims for sexual harassment and negligent retention.

IT IS SO ORDERED.

_____s/Susan J. Dlott_____
Susan J. Dlott
United States District Judge

16